UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
TROY MASSON, individually and on behalf    :
of others similarly situated,              :
                                           :
                         Plaintiff,        :    04 Civ. 4488 (MBM)
                                           :
            -against-                      :    OPINION AND ORDER
                                           :
ECOLAB, INC.,                              :
                                           :
                         Defendant.        :
----------------------------------------X

APPEARANCES:

MICHAEL J.D. SWEENEY, ESQ.
TARA BERNSTEIN, ESQ.
(Attorneys for Plaintiff Troy Masson)
Law Office of Dan Getman
9 Paradies Lane
New Paltz, NY 12561
(845) 255-9370

MARC S. WENGER, ESQ.
JEFFREY W. BRECHER, ESQ.
(Attorneys for Defendant Ecolab, Inc.)
Jackson Lewis LLP
58 South Service Road, Suite 410
Melville, NY 11747
(631) 247-0404

MICHAEL B. MUKASEY, U.S.D.J.

Plaintiff Troy Masson, individually and on behalf of others similarly situated, sues Ecolab, Inc. for overtime pay under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. Ecolab moves for summary judgment, arguing that Masson is subject to the authority of the United States Secretary of Transportation with respect to his qualifications and maximum hours of service and thus exempt from the overtime requirement of the FLSA. Masson opposes the motion and seeks approval for distribution of collective action notices and opt-in consent forms to potential plaintiffs. So far, two others, Claude Gerald Hester, Jr. and Justin Duffie, have submitted opt-in forms. Although the record does not contain enough evidence for this court to determine as a matter of law which plaintiffs, if any, are entitled to overtime compensation under the FLSA, the parties have provided enough evidence for this court to determine which job activities potential plaintiffs would have had to have performed at Ecolab so as to be exempt from the FLSA's overtime requirement. Hence, for the reasons set forth below, Ecolab's motion is denied and Masson's is granted.

I.

Ecolab develops and markets cleaning, sanitizing, pest control, and other maintenance products and services. (Ecolab

Rule 56.1 Statement ¶ 1; Affidavit of Gilbert Lewis ("Lewis Aff.") ¶ 4)  It employs more than 21,000 people worldwide. (Ecolab Rule 56.1 Statement ¶ 2)  Its customers, located in over 160 countries, include hotels, restaurants, health and educational facilities, convenience and grocery stores, commercial and institutional laundries, food and beverage processors, and car washes.  (<u>Id.</u>)

Ecolab's leases of commercial equipment include regular preventive maintenance and repair services.  (<u>Id.</u> ¶ 9)  Ecolab's Route Managers provide these services.  (<u>Id.</u> ¶ 10)  According to Ecolab, Route Managers are assigned to specific geographic territories, of which some cover parts of two states.  (<u>Id.</u> ¶ 14)  Ecolab claims that as of February 2005, it employs approximately 642 Route Managers throughout the country and that approximately 17 percent of these Route Managers are assigned to territories covering more than one state.  (<u>Id.</u>)

Masson worked as a Route Manager from April 7, 2003 to May 21, 2004 (Ecolab Rule 56.1 Statement ¶¶ 15-16), Duffie from April 8, 2002 to January 15, 2004 (<u>Id.</u> ¶¶ 23-24)[1], and Hester from June 2, 2003 to July 9, 2004.  (<u>Id.</u> ¶¶ 31-32)  All three worked in the Southeast Area of Ecolab's Institutional Division,

---

[1]    Duffie began his employment as a "Sales/Service Representative" but was renamed a Route Manager in January 2003. According to Ecolab, his duties were the same under either title. (Ecolab Rule 56.1 Statement ¶ 23)

which serves the foodservice and hospitality industries. (Lewis
Aff. ¶ 11)  The Southeast Area appears to cover South Carolina,
North Carolina, most of Georgia, and part of Tennessee. (Ex. B
to Lewis Aff.)  However, plaintiffs provided maintenance and
repair services for dishwashing machines leased by Ecolab to
customers only in the Atlanta metropolitan area; none left
Georgia as part of their employment with Ecolab. (Pls.' Rule
56.1 Response ¶¶ 19, 27, 35) Ecolab provided them with company
vehicles to drive to customer locations. (Ecolab Rule 56.1
Statement ¶¶ 20, 28, 36)  None reported regularly to an Ecolab
office.  Instead, they drove from customer to customer during the
work day and at day's end returned to their respective homes.
(Id. ¶¶ 21, 29, 37)

Plaintiffs did not fill out timesheets. (Ecolab Rule
56.1 Statement ¶ 11)  However, they were required to fill out
"Edge Reports" that identified customers served each day. (Id.)

Masson states that he had about 115 to 130 customers on
his route, and on average made between eight and 10 service calls
per day. (Ex. 3 to Affidavit of Tara Bernstein ("Bernstein
Aff."))  Hester served 156 customers, and on average made 45
service calls per week. (Ex. 4 to Bernstein Aff.)  He made an
additional 10 to 12 service calls every third weekend. (Id.)
Duffie states that "the number of customers on [his] route
fluctuated between about 110 and 180, depending on the time

period" and that during an average week, would make 45 service calls.  (Ex. 5 to Bernstein Aff.)  Like Hester, he made about 15 additional service calls every third weekend.  (Id.)

According to Ecolab, when customers needed equipment or other products from Ecolab, plaintiffs ordered the products from Ecolab's manufacturing facilities located outside Georgia, most often from Beloit, Illinois.  (Ecolab Rule 56.1 Statement ¶ 41) The products were shipped either to each customer's location or to the Route Manager's home address.  (Lewis Aff. ¶ 48)

Ecolab has submitted lists of products ordered by plaintiffs during their employment with Ecolab that show most orders were shipped to plaintiffs' homes.  (Ex. C to Lewis Aff.) For example, the first entry, Order Number 299402, indicates that Masson ordered four items on May 3, 2004 from the Beloit, Illinois facility.  (Id.)  These items were shipped to Masson's home in McDonough, Georgia.  (Id.)  In contrast, the second entry lists "A&A Steakhouse" as the customer and the location where the item was shipped.  (Id.)  The lists show a total of 605 orders by Masson, 473 by Duffie, and 114 by Hester.[2]

According to Gilbert Lewis, a former Area Route Manager

_____

[2]     Duffie's list encompasses his orders from December 2002 through December 2003; Ecolab claims that it does not have any ordering records for the first eight months of Duffie's employment with Ecolab, but that those available "can be used as an accurate estimate of the type and frequency of orders during the first eight months of his employment."  (Lewis Aff. ¶ 45)

4

for the Southeast Area of Ecolab's Institutional Division,[3] "some
of the equipment and products that were ordered by Plaintiffs and
shipped directly to their homes were for use as truck stock,
while other equipment and products were for specific customers."
(Ecolab Rule 56.1 Statement ¶ 49; Lewis Aff. ¶ 52)  Separate
lists submitted by Ecolab show which orders, according to Lewis,
were shipped to plaintiffs' homes pursuant to specific customer
orders as opposed to orders to fill plaintiffs' inventory.  (Ex.
3 to Lewis Aff.)  Of such orders 64 are attributed to Masson, 242
to Duffie, and 13 to Hester.  (Id. ¶¶ 53-55) Lewis stated also
that "[b]ecause any of Plaintiffs' customers could, at any time,
require replacement parts or products, Plaintiffs could be called
upon to transport a shipment of goods in interstate commerce at
any time."  (Id. ¶ 61)

Lewis "was able to identify which products and
equipment were customer specific orders based on [his]
approximate ten years of experience working in the Institutional
Division [the Division in which Plaintiffs were employed], in
various supervisory positions."  (Lewis Supplemental Aff. ¶ 4)
He cites three examples.  The first "customer-specific item

---

[3]     Within each Ecolab region, the hierarchy and reporting
structure is as follows: Route Managers report to a Route
Supervisor; the Route Supervisor to an Area Route Manager; the
Area Route Manager to the Area Manager; and the Area Manager to
the Vice President of Sales, who is located at Ecolab's corporate
headquarters in St. Paul, Minnesota.  (Lewis Aff. ¶ 9)

listed for [] Masson . . . is one of Ecolab's dispensing systems"
for certain detergents and sanitizers.  (Id. ¶ 5) Lewis claims
that the dispenser "would not be a dispenser [] Masson would have
kept as truck stock" and that "[i]t was probably ordered because"
one such dispenser "that a customer was using malfunctioned."
(Id.)  Moreover, according to Lewis, "Route Managers do not keep
dispensers as truck stock, nor do they have large enough trucks
that would enable them to do so."  (Id.)

The second example is "a solid rinse additive" that
Lewis surmises "was likely ordered for a specific customer as a
means to improve customer relations because a dispenser
malfunctioned."  (Id. ¶ 6)  The third item, a dishwasher motor,
is "too heavy to keep as truck stock."  (Id. ¶ 7)  Lewis noted
also that chemical products are not kept as truck stock.  (Id. ¶
6)

Plaintiffs contend that they have not had adequate
opportunity to discover how these lists were compiled.  In any
event, plaintiffs state that they kept an inventory of products
and equipment needed to maintain and repair customers'
dishwashing machines.  (Ex. 3 to Bernstein Aff. ¶ 4; Ex. 4 to
Bernstein Aff. ¶ 4; Ex. 5 to Bernstein Aff. ¶ 4)  Masson and
Duffie kept inventory in their trucks and homes (Ex. 3 to
Bernstein Aff. ¶ 4; Ex. 5 to Bernstein Aff. ¶ 4); Hester states
that he kept inventory in his truck.  (Ex. 4 to Bernstein Aff. ¶

4) Plaintiffs claim that they ordered new inventory to be sent directly to their homes so that they could restock whenever they used a part on a service call or when inventory ran low. (Exs. 3-5 to Bernstein Aff. ¶ 4) Hester states that he never ordered products for specific customers to be sent to his home and that such products were sent directly to the customer. (Ex. 4 to Bernstein Aff. ¶ 4) Masson claims that "[o]nly under extraordinary circumstances would [he] order a part for a specific customer delivered directly to [him]" instead of to the customer. (Ex. 3 to Bernstein Aff. ¶ 4) Upon his "information and belief," such deliveries "occurred only 10 times in the entire time [he] worked for Ecolab," constituting "approximately 0.4 % of [his] service calls." (Id.) Duffie remembers "two instances that a product or equipment for a specific customer was delivered directly to [his home address]," constituting "approximately 0.04 % of the calls that [he] made." (Ex. 5 to Bernstein Aff. ¶ 4)

From some customers, the three plaintiffs picked up checks payable to Ecolab for services, parts, or equipment, either because the customer preferred to pay the Route Manager or because the customer's payment was late or the account not fully paid. (Ecolab Rule 56.1 Statement ¶¶ 22, 30, 39) Ecolab claims that on each such occasion, the Route Managers delivered the customer check to a local post office or the local Ecolab office

for mailing to North Carolina where Ecolab collects and processes the checks. (Id. ¶¶ 22, 30, 39)  Ecolab states also that none of the checks were processed at the local office in Georgia and that customer invoices "specifically state that payment must be sent to Charlotte, North Carolina." (Supplemental Affidavit of Gilbert Lewis ("Lewis Supplemental Aff.") ¶ 8)

Masson claims that he picked up checks from customers only about three times per week and "typically deliver[ed] [them] to Ecolab's local office in Georgia." (Pls.' Rule 56.1 Response ¶ 22)  He gave the checks to his supervisor or another repairman to bring back to the local office. (Id.)  Only about two or three times per month did he mail a customer's check himself. (Id.)  Duffie claims that he picked up checks from customers approximately once in every 45 service calls as payment on overdue accounts. (Id. ¶ 30)  He "almost always delivered the check to his supervisor" and "remembers only two occasions when he mailed a customer's check" himself. (Id.)

Hester participated in an Ecolab pilot program referred to as the "Atlanta Delivery Model," from December 2003 to July 2004. (Ecolab Rule 56.1 Statement ¶ 38)  Under this program, Ecolab itself shipped products to a warehouse in Georgia, instead of using a third party carrier such as the United Parcel Service. (Id.)  According to Ecolab, Hester then would pick up a product from the warehouse and deliver it to the customer.  He collected

8

a check from the customer and delivered it to a local post office, where it was mailed to an Ecolab office in North Carolina. (Id.) Hester claims that under the program, he picked up products from the warehouse to store on his truck and distribute to customers as they needed them -- i.e., as inventory, and that "[a]ny checks he picked up from customers were not for the specific products, but for payment on the customer's account." (Pls.' Rule 56.1 Response § 38) In addition, as part of the pilot program, he claims that he "ordinarily went to the local Ecolab office each work day and delivered any checks he received from customers at that time." (Id.)

Before Hester participated in the pilot program, "a substantial part of his customers did not ask him to accept checks" and of the times he did pick up checks from customers, he remembers only two occasions when he mailed them. (Id. ¶ 39) He delivered all of the other checks to the local Ecolab office in Georgia. (Id.)

Plaintiffs claim that they regularly worked more than 40 hours per week for Ecolab and that Ecolab failed to pay them overtime compensation at the rate of time and one-half for all hours worked over 40. (Compl. ¶¶ 16-17; Declaration of Troy Masson dated 2/15/05 ("Masson Decl.") ¶¶ 7, 9; Declaration of Justin Duffie dated 2/15/05 ("Duffie Decl.") ¶¶ 8, 10;

Declaration of Claude Gerald Hester, Jr. dated 2/16/05 ("Hester Decl.") ¶¶ 7, 9)  Ecolab admits that it did not pay Masson overtime at the one and one-half rate.  (Ex. D to Pls.' Brief (Ecolab Answer) ¶ 17)  Moreover, Ecolab admits that "it does not pay time-and-one-half overtime premium pay to salaried employees."  (Id. ¶ 8)

Masson filed the instant complaint on June 15, 2004, suing for a declaration that Ecolab violated the FLSA willfully, and for damages in the amount of unpaid overtime wages as well as liquidated damages.  On October 25, 2004, Hester filed a consent form "opting in" to the lawsuit.  (Ex. 1 to Affirmation of Marc Wenger ("Wenger Aff.")  Duffie did the same on November 5, 2004. (Id.)

II.

Congress' goal in enacting the FLSA was "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a)).  Section 207 of the FLSA provides that covered employees who work more than 40 hours in a workweek shall be paid at least one and one-half times their

regular pay rate for those hours worked above 40 hours.  <u>See</u> 29
U.S.C. § 207(a)(1).

Three years before passing the FLSA, Congress enacted
the Motor Carrier Act of 1935 ("MCA").  The purpose of the MCA
was to promote efficiency, economy, and safety in the motor
transportation industry and, to help achieve that purpose, the
MCA gave the Interstate Commerce Commission ("ICC") the authority
to regulate the maximum hours of work for employees of "common
carriers" and "contract carriers" by motor vehicle.  The MCA also
gave the ICC similar regulatory authority over employees of
"private carriers" by motor vehicle if the ICC concluded that
such regulation was necessary to promote safety on the nation's
roadways.  <u>See</u> <u>Friedrich</u> v. <u>U.S. Computer Servs.</u>, 974 F.2d 409,
412 (3d Cir. 1992).  These regulatory powers have been
transferred since from the ICC to the Department of
Transportation ("DOT").  <u>See id.</u>

So that the overtime provisions of the FLSA and MCA do
not overlap or interfere with each other, those employees whose
working hours are regulated by the DOT are exempt from the FLSA's
requirements.  <u>See</u> 29 U.S.C. § 213(b)(1) (FLSA overtime
requirements "shall not apply with respect to . . . any employee
with respect to whom the Secretary of Transportation has power to
establish qualifications and maximum hours of service pursuant to
the provisions of section 31502 of Title 49 . . . .") (hereafter

11

referred to as "motor carrier exemption").  The exemption
applies to employees over whom the Secretary of Transportation
has jurisdiction regardless of whether he has actually exercised
his power as to those employees.  See 29 C.F.R. § 782.1(a)
(2004); Bilyou v. Dutchess Beer Distrib., Inc., 300 F.3d 217, 222
(2d Cir. 2002).

Pursuant to his authority under the MCA, the "Secretary
of Transportation may prescribe requirements for . . .
qualifications and maximum hours of service of employees of, and
standards of equipment of, a motor private carrier, when needed
to promote safety of operation."  49 U.S.C. § 31502(b)(2).  For
the motor carrier exemption to apply, the employee's activities
first must "affect the safety of operation of motor vehicles
engaged in such transportation."  Morris v. McComb, 332 U.S. 422,
439 (1947).  Second, in this case, the employer must be a
"private motor carrier," which is defined as

> a person, other than a motor carrier,
> transporting property by motor vehicle when--
> (A) the transportation is as provided in
> section 13501 of this title;
> (B) the person is the owner, lessee, or
> bailee of the property being transported; and
> (C) the property is being transported for
> sale, lease, rent, or bailment or to further
> a commercial enterprise.

49 U.S.C. § 13102(13).[4]  Section 13501 gives the Secretary of

---

[4]     A "private motor carrier" is different from a "motor
carrier" or "common carrier," which is defined as "a person
providing motor vehicle transportation for compensation."  49

12

Transportation jurisdiction over transportation by private motor

carrier if passengers or property are transported by such carrier

> (1) between a place in --
> (A) a State and a place in another State;
> (B) a State and another place in the same
> State through another State. . . .

49 U.S.C. § 13501.

Section 13501 has been interpreted to cover intrastate

transportation of property that is part of a "'practical

continuity of movement' in the flow of interstate commerce."

<u>Bilyou</u> v. <u>Dutchess Beer Distrib. Inc.</u>, 300 F.3d 217, 223 (2d Cir.

2002) (quoting <u>Walling</u> v. <u>Jacksonville Paper Co.</u>, 317 U.S. 564,

568 (1943)).  Put another way, if the shipper's "fixed and

persisting transportation intent at the time of [interstate]

shipment" was to deliver an item to a specified customer who had

ordered the item, regardless of whether it was stored temporarily

intrastate, the motor carrier exemption applies.  <u>Id.</u> at 223-24;

<u>see also</u> <u>McGuiggan</u> v. <u>CPC Int'l, Inc.</u>, 84 F. Supp.2d 470, 483

(S.D.N.Y. 2000) (motor carrier exemption applied to drivers who

delivered English muffins, baked out-of-state, to intrastate

customers pursuant to specific orders).  On the other hand, the

exemption does not apply where items are delivered from out of

state to an intrastate location, such as a warehouse, for future

delivery to customers yet to be identified.  In other words, the

---

U.S.C. § 13102(12).

exemption is inapplicable where the final destination of any
shipment is not decided "until after the goods had come to rest
in the warehouse." Southern Pac. Transp. Co. v. Interstate
Commerce Comm'n, 565 F.2d 615, 618 (9th Cir. 1977).


III.

Ecolab argues that plaintiffs' job activities at Ecolab
satisfied the motor carrier exemption in two ways: through (i)
plaintiffs' transport of equipment and parts pursuant to specific
customer orders; and (ii) plaintiffs' handling of customer
checks.  The issues related to equipment and parts are addressed
immediately below; those related to checks are addressed in
Section IV.

The motor carrier exemption, like all exemptions to the
FLSA, is "narrowly construed against the employers seeking to
assert them and their application limited to those establishments
plainly and unmistakably within their terms and spirit."  Arnold
v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960).

Ecolab bears the burden of proving that the exemption
applies.  See Bilyou, 300 F.3d at 222.  Because "the exemption
depends . . . upon the activities of the individual employees,"
Ecolab must present evidence as to "the character of the
activities involved in the performance" of each plaintiff's job
in order to determine whether Ecolab owes individual employees

overtime compensation.  Goldberg v. Faber Indus., Inc., 291 F.2d 232, 235 (7th Cir. 1961).  Hence, the activities of one or a few plaintiffs cannot justify a blanket exemption as to all plaintiff-employees.

Similarly, the activities of a plaintiff in one workweek do not always determine that plaintiff's exempt status for his entire period of employment.  On the one hand, if the employee is or "is likely" to be "called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities," he falls under the exemption "in all workweeks when he is employed at such job . . . regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek."  29 C.F.R. § 782.2(b)(3).  In such cases, "the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting 'safety of operation.'"  Id.

On the other hand, the exemption does not apply to an employee's entire term of employment if the "continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, or insignificant as to be de minimis."  Id. For such employees, "[i]f in particular workweeks other duties are assigned to him which result, in those workweeks, in his

performance of activities directly affecting the safety of operation of motor vehicles in interstate commerce on the public highways, the exemption will be applicable to him those workweeks, but not in the workweeks when he continues to perform the duties of the non-safety-affecting job." Id. The Department of Labor recognizes that an employee's exempt status may vary from week to week if the employer shifts the employee "from one job to another periodically or on occasion." Id. § 782.2(b)(4). Hence, the only way to determine the overtime compensation owed to an employee is to examine the job duties of the employee for each week of employment.

As to Ecolab parts and equipment, plaintiffs do not dispute that Ecolab is a "person . . . transporting property by motor vehicle" and thus a "private motor carrier." Nor is it contested that Ecolab is "the owner . . . of the property being transported" and that "the property is being transported for sale . . . or to further a commercial enterprise." 49 U.S.C. § 13102(13).

It is undisputed also that any intrastate transport by plaintiffs of equipment or parts ordered for specific customers constitutes "interstate commerce" for purposes of the motor carrier exemption. However, the parties disagree as to how much of plaintiffs' intrastate activities were of this character, and whether this quantum of activities was sufficient to bring

plaintiffs under the DOT's jurisdiction.

Plaintiffs insist that, even if deliveries of items ordered by specific customers involve interstate commerce, the motor carrier exemption should not apply here because Ecolab has failed to prove that these deliveries constituted more than a de minimis portion of plaintiffs' job responsibilities. See <u>Pyramid Motor</u> v. <u>Ispass</u>, 330 U.S. 695, 708 (1947) (remanded with instructions that if the mere handling of freight before loading formed a "trivial, casual or occasional a part of an employee's activities," and hence did not affect the safety of operation, then the activity would not serve to bring the employees under the motor carrier exemption).

In determining whether an employee's activities have a "substantial direct effect" on the safety of motor vehicle operation in interstate commerce and if so, whether such activities are de minimis, it is important to focus on "the character of the activities rather than the proportion of either the employee's time or of his activities." <u>Levinson</u> v. <u>Spector Motor Serv.</u>, 330 U.S. 649, 674-75 (1947). The underlying concern is "the actual need for the [Secretary of Transportation]'s power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment." <u>Id.</u> In <u>Crooker</u> v. <u>Sexton Motors, Inc.</u>, 469 F.2d 206, 210 (1st Cir. 1972), the First Circuit observed:

> The de minimis rule has been applied . . .
> where the employee's connection with anything
> affecting interstate motor carrier operations
> was so indirect and casual as to be trivial.
> . . . The activities of one who drives in
> interstate commerce, however frequently or
> infrequently, are not trivial. Such
> activities directly affect the safety of
> motor vehicle operations.

(citation omitted). Based on Crooker and other cases, Ecolab

argues that the de minimis rule does not apply to drivers,

regardless of how insignificant or infrequent their safety-

affecting interstate activities are. See also Badgett v. Rent-

Way, Inc., 350 F. Supp.2d 642, 654 (W.D. Pa. 2004); Walton v.

Louisiana Compressor Maint., No. 96-2156, 1997 WL 129393, at *3

(E.D. La. Mar. 19, 1997); Brennan v. Cardinal Indus., Inc., No.

74-563, 1976 WL 1720, at *3-4 (S.D. Ohio Mar. 8, 1976).

Although the de minimis rule has limited applicability

to drivers for the reasons stated by the First Circuit in

Crooker, no court has adopted Ecolab's blanket proposition. Even

in Crooker, the First Circuit, while remanding the case to the

district court for a week-by-week determination of whether

overtime was due to the driver-plaintiffs, recognized that the

motor carrier exemption did not relieve an employer of all FLSA

overtime obligations if driving in interstate commerce was not a

regular and expected part of an employee's duties. See 469 F.2d

at 210-11. To extend the motor carrier exemption to any driving

activity, no matter how infrequent or trivial, would be to

encourage employers to send their employees on a minimal number of interstate trips simply to avoid the overtime compensation provisions of FLSA.

Instead, where "the employer's interstate activities affecting the safety of interstate motor operations are de minimis," the employer's exemption from FLSA requirements under the MCA "consequently fades." Peraro v. Chemlawn Servs. Corp., 692 F. Supp. 109, 114 (D. Conn. 1988). Moreover, the cases relied on by Ecolab involved drivers' transport of property across state lines, as well as the "reasonable expectation" that drivers could be called on to drive across state lines. Crooker, 469 F.2d at 210 (driver made trips from New Hampshire to Massachusetts); Badgett, 350 F. Supp.2d at 654 (drivers "could have been called upon in the regular course of their employment to make trips affecting interstate commerce," including ones from Pennsylvania to Ohio); Walton, 1997 WL 129393, at *2-3 (plaintiff driver drove out of state regularly); Brennan, 1978 WL 1720, at *4-6 (interstate routes assigned indiscriminately among pool of drivers). It was this activity that courts deemed "not trivial," because it "directly" affected employers' interstate motor vehicle operations, Crooker, 469 F.2d at 209, and fell "plainly and unmistakably within [the] terms and spirit" of the motor carrier exemption. Arnold, 361 U.S. at 392; see also 49 U.S.C. § 13501 (DOT has jurisdiction over transport "between a place in a

19

State and . . . a place in another State"). The same has not and cannot be said about wholly intrastate trips. Driving in interstate commerce alone does not trigger the motor carrier exemption. Such driving, however frequent, must have been an expected and regular part of an employee's job duties.

Hence, determining the "character" of interstate driving involves a fact-specific analysis, including an examination of the method by which the employer assigns the interstate activity to the pertinent class of employees, the nature of the employer's business, and perhaps to a lesser degree, the proportion of interstate-to-intrastate employee activity. In <u>Morris</u> v. <u>McComb</u>, the Supreme Court held that although only 3.65 percent of the total trips made by the drivers of a general carriage business were out of state, the carrier was exempt from the overtime provision of the FLSA as to all drivers and certain mechanics. <u>See</u> 332 U.S. at 433. The Court based its decision on a few key characteristics of the carrier's regular operations. First, the carrier did not distinguish the interstate and intrastate routes and assigned the routes indiscriminately to all its drivers; hence, individual drivers at any time could be called on to drive across state lines. A closer look at the statistics revealed that each driver's interstate travel was more significant than was suggested by the 3.65 percent figure. Approximately one-quarter of all of the

20

drivers made at least one interstate trip in each week of the relevant time period. There was a six-week period in which more than half the drivers made an out-of-state trip. Throughout the year, all but two of the drivers made at least one interstate trip. Finally, the Court found the general nature of the carrier's business significant: the carrier offered "to serve the normal transportation demands of the shipping public in an industrial metropolitan center [Detroit, Michigan]. . . . If the common carrier is required, by virtue of that status, to take this interstate business he must perform the required service in accordance with the requirements established by the [Interstate Commerce] Commission." <u>Id.</u> at 434. In sum, the interstate trips were "a natural, integral and apparently inseparable part of the common carrier service of the petitioner and his drivers." <u>Id.</u> at 433.

In light of <u>Morris</u>, courts faced with determining the applicability of the motor carrier exemption to drivers focus on the route-assignment procedure. For example, in <u>Brennan</u>, a carrier was held exempt from paying any of its drivers overtime compensation because the carrier assigned its drivers indiscriminately to interstate routes, although less than one percent of the drivers' total travel time involved the interstate routes. <u>See</u> 1978 WL 1720, at *4-6. Similarly, in <u>Griffin</u> v. <u>Consol. Foods Corp.</u>, the Fourth Circuit found the motor carrier

exemption applicable to all of the employer's sales representatives because the representatives were indiscriminately reassigned to the sales circuits semi-annually.  See 771 F.2d 826, 828-29 (4th Cir. 1985).

In contrast, the Seventh Circuit in Goldberg v. Faber Indus., Inc., held that the defendant was required to pay overtime compensation to 15 of its drivers who, unlike five other drivers, never traveled interstate on the defendant's behalf. See 291 F.2d at 235.  The Court refused to grant a blanket exemption to the entire class of drivers because, except during absences, each driver was specifically assigned to a route.  Id. The defendant failed to prove that any driver regularly assigned to an intrastate route ever drove an interstate route.  Id.

Over all, the de minimis rule has been held to apply to drivers who, as a class, spent less than one percent of their time traveling across state lines and were not in the regular course of their employment expected to drive across state lines. Compare Kimball v. Goodyear Tire and Rubber Co., 504 F. Supp. 544, 549 (E.D. Tex. 1980) (no blanket exemption for defendant company where 0.17 percent of total trips made by drivers were interstate, many drivers had never made interstate trips, and routes were assigned based on seniority); Coleman v. Jiffy June Farms, Inc., 324 F. Supp. 664, 670 (S.D. Ala. 1970) (drivers were not subject to the motor carrier exemption where employer was

involved in carriage "only as an incident of [its] poultry

processing business," only 0.23 percent of the activity was

interstate, loads carried were light, and interstate deliveries

were to a location on the state border); with Turk v. Buffets,

Inc., 940 F. Supp. 1255, 1261 (N.D. Ill. 1996) (holding that

motor carrier exemption applied where more than one percent of

plaintiff drivers' driving was out of state and drivers could

expect to drive across state lines).[5]

    In this case, the parties' affidavits leave factual

---

[5]    Plaintiffs cite also a similar lawsuit brought against
Ecolab in the Middle District of Florida, where the Court
"decline[d] to agree with [Ecolab] that the 1% of Plaintiff's
orders, which are specifically requested for a customer, is
sufficiently similar to cases in which the vast majority of
orders were specific to a customer need." Neely v. Ecolab, Inc.,
No. 03-597-J-20, slip op. at 5 (M.D. Fla. June 22, 2004). The
plaintiffs in that case were "Sales/Service Route Specialists"
and as described by the Court, performed duties similar to those
performed by Masson, Duffie, and Hester. Id. at 1-2. That case
has since settled. See Neely v. Ecolab, Inc., No. 03-597-J-20
(M.D. Fla. Sept. 21, 2004) (order dismissing case upon
settlement).
    Ecolab has submitted a Department of Labor "Compliance
Action Report" that it claims applies to the plaintiffs in Neely.
That Report found the motor carrier exemption applicable to
Sales/Service Route Specialists employed in Ecolab's Puritan
Services Division because (i) 71.5 percent of those employees
were assigned to multi-state "territories"; (ii) they regularly
delivered items ordered for specific customers but shipped
initially to the employees' homes; and (iii) all such employees
were likely to cross state lines as part of weekend "on call"
duties. ("WHISARD Compliance Action Report," Case ID 1393313
(attached to letter from Jeffrey Brecher to court dated
8/2/2005)) Whether the above Report does or should apply to
plaintiffs in this case, who were Route Managers in Ecolab's
Institutional Division, cannot be determined on the current
record.

issues as to what portion of plaintiffs' service calls were at least in part deliveries of customer-specific product orders. According to Lewis, approximately 10 percent of Masson's orders, more than half of Hester's, and approximately 11 percent of Duffie's were such service calls.

Masson avers that only 10 such orders were shipped to his home, and that delivery of such orders constituted 0.4 percent of his service calls. Duffie recalls only two such orders as part of his employment. Hester asserts that the only products shipped to his home address were for his inventory and that he did not order any items for specific customers to be sent directly to his home.

However, the frequency of such orders is not dispositive. Also important is whether, or to what extent, certain orders were made with particular customers in mind and sent to plaintiffs' homes in anticipation of having to meet a particular customer's future needs. In Walling v. Jacksonville Paper Co., the Supreme Court considered such circumstances when it formulated the following framework for determining whether intrastate movements are "interstate" for purposes of the motor carrier exemption:

> The entry of the goods into the warehouse
> interrupts but does not necessarily terminate
> their interstate journey. A temporary pause
> in their transit does not mean that they are
> no longer 'in commerce' within the meaning of
> the Act. . . . [I]f the halt in the movement

> of the goods is a convenient intermediate
> step in the process of getting them to their
> final destinations, they remain 'in commerce'
> until they reach those points. Then there is
> a practical continuity of movement of the
> goods until they reach the customers of whom
> they are intended. That is sufficient. Any
> other test would allow formalities to conceal
> the continuous nature of the interstate
> transit which constitutes commerce.

317 U.S. at 568. The Court envisioned three circumstances when goods were brought from out of state but sold and distributed to customers within the state:

i) Goods purchased by the wholesaler or distributor upon order of a customer with the definite intention that they be carried at once to the customer;

ii) Goods obtained by the wholesaler or distributor to meet the needs of specified customers pursuant to an "understanding," contractual or otherwise, although not for immediate delivery; and

iii) Goods based on anticipation of customer need, rather than upon prior orders or contracts.

The Court held that the goods in the first two categories remain in interstate commerce until the time they are delivered to the retail customers. Goods in the third category could be held to remain in interstate commerce only when there is a "particularity" of evidence relating to a product and a customer, as opposed to "goods acquired and held by a local merchant for local disposition" to the general public. Id. at 570; see also

Foxworthy v. Hiland Dairy Co., 997 F.2d 670, 673 (10th Cir. 1993); Middle West Motor Freight Bureau v. Interstate Commerce Comm'n, 867 F.2d 458, 460 (8th Cir. 1989). Whether any of the orders shipped to plaintiffs' addresses falls under any of the above categories cannot be determined at this stage.

There remain factual issues also as to whether plaintiffs could have been called on to cross state lines during their employment. Although Ecolab claims that 17 percent of its Route Managers are assigned to multi-state routes, it has not established or even suggested that out-of-state service calls were assigned indiscriminately among drivers such that plaintiffs could be "reasonably expected" to travel interstate as part of their jobs. See Goldberg, 291 F.2d at 234 (motor carrier exemption inapplicable to certain employees because the parties had stipulated that the subject employees who were assigned to intrastate routes could not reasonably be expected to handle interstate runs in the normal course of their duties).

Likewise, it is disputed at this stage whether it was only under "extraordinary" circumstances (Ex. 3 to Bernstein Aff.) that plaintiffs ordered items for specific customers and then delivered them, or "likely" that they could be "called upon in the ordinary course of [their] work" to do so. 29 C.F.R. § 782.2(b)(3); see also Badgett, 350 F. Supp.2d at 657-58. At least as to plaintiffs' service calls, Ecolab fails to establish

that plaintiffs were engaged in the kind and extent of activities that fall under the motor carrier exemption.  See <u>Nora Beverages, Inc.</u> v. <u>Perrier Group of Am., Inc.</u>, 164 F.3d 736, 742 (2d Cir. 1998) (on summary judgment motion, ambiguities and all reasonable factual inferences must be drawn in favor of non-movant).

IV.

Ecolab argues also that the motor carrier exemption applies to plaintiffs' handling of customer checks.  Because the checks were bound ultimately for Charlotte, North Carolina to be processed, Ecolab contends that plaintiffs' carrying of the checks constitutes the requisite participation in interstate commerce for purposes of the motor carrier exemption.

The DOL's Wage and Hour Division Field Operations Handbook provides that as to private motor carriers, "where the transportation of property is incidental to a trip and not the primary purpose," such transportation does not fall under the jurisdiction of the Secretary of Transportation.  (Ex. 6 to Bernstein Decl.)  The Handbook illustrates that an employee "would not be considered as engaged in transporting property for purposes of the Motor Carrier Act because of an arrangement to drive by the post office on his way to or from work to pick up or deliver his employer's interstate mail . . . ."  (<u>Id.</u>)

Although the DOT is not bound by the DOL's

interpretation of the DOT's authority under the motor carrier
exemption, the DOL's distinction is persuasive, particularly in
the absence of contrary authority. It recognizes that a private
motor carrier's primary business typically will involve something
other than carriage. Such is the distinction between this case
and Baez v. Wells Fargo Armored Serv. Corp., 938 F.2d 180 (11th
Cir. 1991), on which Ecolab relies in arguing that the
transportation of checks places plaintiffs within the motor
carrier exemption. In Baez, the Eleventh Circuit held that
armored truck guards employed by a contract carrier who picked up
checks and other monetary instruments from Miami area financial
institutions, but traveled only intrastate, fell under the motor
carrier exemption because the instruments were bound for banks
outside the state of Florida. Id. at 181-82. However, the
employer's business in Baez was carriage; transportation of the
checks was the primary purpose of the employees' trips.

    The Third Circuit's reasoning in Friedrich is
instructive as well. The plaintiffs in that case were field
engineers employed by a company that provided computer hardware
and software installation, maintenance, and repair services.
They routinely crossed state lines in the course of their duties,
carrying with them a tool kit, replacement parts, and other
equipment. The Court acknowledged that the MCA does not define
property and that "it is arguable that the tools, parts, and

28

equipment the plaintiffs transported were so trivial or
insubstantial that they did not constitute property within the
meaning of the MCA." 974 F.2d at 417. However, the Court
concluded that because transportation of those items "was an
independent and essential reason for their service trips" -- in
that the employees could not have performed their primary duties
without them -- the tools, parts, and equipment "constituted
property within the meaning of the MCA." Id.

        Even adopting the Third Circuit's "broad construction"
of the term "property" as used in the MCA, Gonzales v. New
England Tractor Trailer Training School, 932 F. Supp. 697,
700-701 (D. Md. 1996) (describing Friedrich), it has not been
demonstrated that plaintiffs' handling of customer checks, on its
own, relieves Ecolab of its FLSA overtime obligations.
Plaintiffs claim that their primary duties were preventive
maintenance and repair of commercial dishwashing machines leased
to customers by Ecolab. Although transport of Ecolab equipment
and parts may have been necessary to execute those duties, as in
Friedrich, the same cannot be said of plaintiffs' pick-up and
delivery of customer checks. Ecolab has not demonstrated that
the handling of customer checks is anything more than a minor,
non-essential part of plaintiffs' duties as Route Managers,
especially where it appears that with a few exceptions, customers
themselves mailed their payments to Ecolab's processing office in

North Carolina.

Construing the motor carrier exemption narrowly and strictly against Ecolab, plaintiffs' handling of customer checks does not fall "plainly and unmistakably within the [exemption's] terms and spirit." Arnold, 367 U.S. 392.

Accordingly, Ecolab's motion for summary judgment is denied.


V.

Section 216(b) of FLSA authorizes an employee to sue his employer for unpaid overtime compensation and liquidated damages on behalf of himself and other employees "similarly situated." 29 U.S.C. § 216(b). In order for an employee to "opt in" to the lawsuit and become a party plaintiff, he must file a written consent. Id. A court has the discretion to authorize notification to "similarly situated" potential plaintiffs and to direct an employer defendant to disclose the names and addresses of those parties. See Patton v. The Thomson Corp., 364 F. Supp.2d 263, 266 (E.D.N.Y. 2005) (citing Hoffman-La Roche, Inc. v. Sperling, 493 U.S. 165, 169 (1989)). Sending a collective action notice to similarly situated individuals "comports with the broad remedial purpose of the [FLSA], . . . as well as with the interest of the courts in avoiding multiplicity of suits." Braunstein v. Eastern Photographic Laboratories, Inc., 600 F.2d

335, 336 (2d Cir. 1979); see also Hoffman v. Sbarro, Inc., 982 F. Supp. 249, 262 (S.D.N.Y. 1997) ("[C]ourts have endorsed the sending of notice early in the proceeding, as a means of facilitating the FLSA's broad remedial purpose and promoting efficient case management.")

The class action requirements of Fed. R. Civ. P. 23 do not apply to the approval of a collective action under the FLSA, and thus "no showing of numerosity, typicality, commonality and representativeness need be made." Foster v. Food Emporium, No. 99-3860, 2000 WL 1737858, at *1 (S.D.N.Y. Apr. 26, 2000). Instead, approval of a collective action under the FLSA involves a two-step inquiry. See, e.g., Gjurovich v. Emmanuel's Marketplace, Inc., 282 F. Supp.2d 91, 96 (S.D.N.Y. 2003); Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1213-14 (5th Cir. 1995). In the first step, the court examines the pleadings and affidavits of the proposed collective action and determines whether the proposed class members are "similarly situated." See Mooney, 54 F.3d at 1213-14. If they appear to be, the court "conditionally certifies" the class. Id. Putative class members are given notice and the opportunity to "opt in" and the action proceeds as a representative action through discovery. Id.

In this early phase, courts employ a relatively lenient evidentiary standard in determining whether a collective action is appropriate. "The inquiry at the inception of the lawsuit is

less stringent than the ultimate determination that the class is properly constituted." <u>Jackson</u> v. <u>New York Tel. Co.</u>, 163 F.R.D. 429, 431 (S.D.N.Y. 1995). Plaintiffs meet this burden by "making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." <u>Hoffman</u>, 982 F. Supp. at 261. The court must determine whether there is a "factual nexus between the [named plaintiff's] situation and the situation of other current and former [employees]." <u>Id.</u> at 262; <u>see also</u> <u>Patton</u>, 364 F. Supp.2d at 268 (authorization of notice "does not prejudice the defendants precisely because it is preliminary . . . [and] may be revisited if it later appears, after appropriate discovery, that the additional plaintiffs . . . are not similarly situated to [the named plaintiff]"). Hence, the merits of plaintiffs' claims need not be evaluated nor discovery be completed in order for such a notice to be approved and disseminated. <u>See</u> <u>Hoffman</u>, 982 F. Supp. at 262.

"The second phase of an FLSA collective action inquiry occurs after discovery is largely complete and 'is typically precipitated by a motion for "decertification" by the defendant.'" <u>Scott</u> v. <u>Aetna Servs., Inc.</u>, 210 F.R.D. 261, 264 (D. Conn. 2002) (quoting <u>Mooney</u>, 54 F.3d at 1214). At that stage, the "similarly situated" issue must be revisited, based on the record produced through discovery. If it is found that the

claimants are similarly situated, the collective action may
proceed to trial. If the claimants are not similarly situated,
the court decertifies the collective action, and the claims of
the opt-in plaintiffs are dismissed.

In this case, the three named plaintiffs worked as
Route Managers for Ecolab. Their primary duties were repair and
preventive maintenance of commercial dishwashing machines. They
routinely worked more than 40 hours per week for Ecolab, were
paid weekly salaries, but were not compensated for any time over
40 hours per week. (Ex. A to Pls.' Brief in Support of Motion
for Collective Action Notice (Declarations of Troy Masson, Justin
Duffie, and Claude Gerald Hester, Jr.)) All three declare "upon
information and belief" that other Ecolab Route Managers were
denied the same compensation. (Id.) Ecolab admits that Masson
was not paid time-and-a-half overtime. (Ecolab Answer ¶ 17)
Moreover, Ecolab admits that "it does not pay time-and-one-half
overtime premium pay to salaried employees." (Id. ¶ 8)

"Substantial allegations by plaintiffs that defendants'
actions violated the FLSA, as well as an admission by defendants
that such actions reflect a company-wide policy, sufficiently
demonstrate a factual nexus between plaintiffs' situation and
other potential class members, and therefore, will support a
finding that plaintiffs and class members are similarly situated
for purposes of sending an FLSA notice." Ayers v. SGS Control

Servs., Inc., No. 03-9078, 2004 WL 2978296, at *5 (S.D.N.Y. Dec. 21, 2004) (citing Hoffman, 982 F. Supp. at 261-62). Whatever the merits of plaintiffs' claims, the above allegations and admissions are sufficient to satisfy plaintiffs' burden at this stage of the litigation. See Legrand v. Educ. Mgmt. Corp, No. 03-9798, 2004 WL 1962076, at *2 (S.D.N.Y. Sept. 2, 2004) (three named plaintiffs not paid overtime and were told by management of defendant company that defendant's employees across the country also had to work over 40 hours per week without overtime pay); Foster, 2000 WL 1737858, at *2 (four named plaintiffs were hourly employees at defendant's food stores, worked through lunch breaks without being paid, worked past time that they punched time cards, and worked on Sundays without being paid double time).

Ecolab argues that issues individual to putative class members predominate and render a collective action notice inappropriate. With regard to the motor carrier exemption, Ecolab foresees extensive discovery as to (i) which Route Managers crossed state lines as part of their routes; (ii) how often they crossed state lines; (iii) for those with solely intrastate routes, what portion of their service calls included customer-specific deliveries; and (iv) whether a Route Manager assigned to an intrastate route could have expected at times to

make an interstate trip.[6]

_____

[6]     In its brief opposing plaintiffs' motion to approve
collective action notice, Ecolab argues that certain potential
plaintiffs may be subject to what has been termed the "outside
sales exemption" to the FLSA's overtime requirement.  29 U.S.C. §
213(a)(1).  Section 213(a)(1) provides that the FLSA's overtime
provisions "shall not apply with respect to . . . [a]ny employee
employed . . . in the capacity of outside salesman. . . ."
According to a Department of Labor regulation, an employee "is
employed in the capacity of outside salesman" if he

> (a) . . . is employed for the purpose of and [] is
> customarily and regularly engaged away from his
> employer's place or places of business in:
> (1) Making sales within the meaning of [29 U.S.C. §
> 203(k)], or
> (2) Obtaining orders or contracts for services or for
> the use of facilities for which a consideration will be
> paid by the client or customer; and
> (3) Whose hours of work of a nature other than
> described in paragraph (a)(1) or (2) of this section do
> not exceed 20 percent of the hours worked in the
> workweek by nonexempt employees of the employer . . .
> provided, that work performed incidental to and in
> conjunction with the employee's own outside sales or
> solicitations, including incidental deliveries and
> collections, shall not be regarded as nonexempt work.

29 C.F.R. § 541.5 (amended Aug. 23, 2004).  Section 203(k)
defines "sale" to include any "sale, exchange, contract to sell,
consignment sale, shipment for sale, or other disposition."
On August 23, 2004, the regulation was amended to
provide:

> (a) The term "employee employed in the capacity of
> outside salesman" . . . shall mean any employee
> (1) Whose primary duty is
> (i) making sales within the meaning of [29 U.S.C. §
> 203(k)], or
> (ii) obtaining orders or contracts for services or for
> the use of facilities for which a consideration will be
> paid by the client or customer; and
> (2) Who is customarily and regularly engaged away from
> the employer's place or places of business in
> performing such primary duty.

There are issues also as to how many Route Managers,
like Hester, participated in the Atlanta Delivery Model pilot
program. Hester claims that under the program, he retrieved
products from a Georgia warehouse -- as opposed to having them
shipped to his or a customer's home -- to store on his truck and
distribute to customers when needed. However, these issues bear
on the applicability of the motor carrier exemption to certain
periods of plaintiffs' employment under Ecolab, and not whether
they "were victims of a common policy or plan" that deprived them
of overtime pay. Hoffman, 982 F. Supp. at 261; see also
Brzychnalski v. Unesco, Inc., 35 F. Supp.2d 351, 353 (S.D.N.Y.
2000). To reiterate, the merits of each plaintiff's claim need
not be decided in order for a notice of collective action to be
approved and disseminated. See Krueger v. New York Tel. Co., No.
93-178/179, 1993 WL 276058, at *2 (S.D.N.Y. July 21, 1993)
("[E]ven if plaintiffs' claims turn out to be meritless or, in

_____

29 C.F.R. § 541.5 (as amended). Ecolab contends that because the
individuals plaintiffs seek to include in the collective action
were employed before and after the date of the regulation's
amendment -- August 23, 2004 -- both versions of the "outside
salesman" exemption must be applied and that such individualized
inquiry militates against approval of a collective action. Like
factual questions raised by the motor carrier exemption,
application of the "outside salesman" exemption bears on the
merits of each plaintiff's claim. Where the parties have barely
addressed the exemption and little, if any discovery has been
conducted on the issue, factual issues raised by the "outside
salesman" exemption do not render a collective action
inappropriate at this stage.

fact, all the plaintiffs turn out not to be similarly situated, notification at this stage, rather than after further discovery, may enable more efficient resolution of the underlying issues in this case.").

At this stage, these factual issues do not bear on whether this case can proceed as a collective action.  Indeed, approval of this collective action is for purposes of discovery as well as notice.  See Frank v. Capital Cities Communications, Inc., 88 F.R.D. 674, 676 (S.D.N.Y. 1981) ("[E]xperiences of other employees may well be probative of the existence vel non of a discriminatory policy. . . .").  The court need not and does not hold definitively that members of the proposed class to whom notices will be sent are in fact situated similarly to plaintiffs.  Too little discovery has been taken to make such a determination now.  Furthermore, should discovery reveal that plaintiffs in fact are not similarly situated, or that only a subset of the proposed class is similarly situated, the class may be decertified or reconstituted later in the litigation.  See Gjurovich, 282 F. Supp.2d at 96.

Ecolab argues that even if this case is to continue as a collective action, plaintiffs' proposed notice must be modified.  First, Ecolab contends that the notice should be sent only to those potential plaintiffs who work or have worked as Route Managers sometime during the last two years.  Claims alleging violations of FLSA overtime requirements are subject to

a two-year statute of limitations, except when the violation is determined ultimately to have been willful; in such cases, the statute of limitations is three years. See 29 U.S.C. § 255(a). Because discovery is at a preliminary stage, "it would be premature at this juncture to reach a determination as to whether the defendant's violations, if any, have been willful." Harrington v. Educ. Mgmt. Corp., No. 02-787, 2002 WL 1343753, at *2 (S.D.N.Y. June 19, 2002). If it is held later that any violation is not willful, claims outside of the two-year limitations period simply can be barred.

Second, Ecolab appears to argue that dissemination of the notice should be limited to Ecolab's Southeast Division. Without more support and in light of its own unqualified admission that it does not pay overtime to its salaried employees -- signaling a company-wide policy -- I see no reason to grant that limitation.

Third, Ecolab claims that the job titles "sales route specialist" and "service professional" referred to in the proposed notice did not exist at Ecolab during "the applicable time period" and that "sales/service representative" was the only other position at Ecolab that carried duties similar to those of Route Managers. (Mem. of Law in Opp'n to Pls.' Motion to Approve Collective Action Notice at 18; see also Lewis Aff. ¶ 26 ("Ecolab never utilized the titles 'sales route specialists' or 'service professional.'")) Ecolab contends that including these non-

existent titles will cause "confusion" among those receiving the notice.  According to a Department of Labor "Compliance Action Report," <u>see</u> supra note 5, there also exist at Ecolab, at least in its Puritan Services Division, employees with the title "Sales/Service Route Specialist."  Regardless, if "sales route specialists" and "service professionals" indeed did not exist at Ecolab during the last three years, logic tells us that no such individuals will join the lawsuit.

Plaintiffs also seek discovery of the names and addresses of those current and former employees of Ecolab who are potential plaintiffs in this action, so that notice and consent forms may be sent to them.  Such discovery is relevant to the subject matter of this action.  Therefore, to insure that employees receive accurate and timely notice concerning the pendency of the collective action, the names of the potential plaintiffs, as defined in the notice, should be disclosed to plaintiffs by Ecolab.

*                    *                    *

         For the reasons set forth above, Ecolab's motion for

summary judgment is denied.  Ecolab will furnish to plaintiffs

within 20 business days hereof the names and last known addresses

of all potential plaintiffs as defined in the attached Notice of

Lawsuit.  Notice, as modified in the attached Notice Of Lawsuit

and Consent to Sue, may be sent to those potential plaintiffs.

The parties are to appear at a conference on September 13, 2005,

at 9:15 a.m.


                                    SO ORDERED:


Dated:    New York, New York        Michael B. Mukasey
          August 17, 2005           U.S. District Judge

                                    40

[To be printed on Plaintiff's lawyer's letterhead]

## NOTICE OF LAWSUIT

1. Introduction to the Case

   This notice is to inform you of a lawsuit pending against Ecolab, Inc. in United States District Court. This lawsuit claims that the defendant violated the Fair Labor Standards Act by failing to pay all eligible employees overtime at one-and-a-half times their regular pay rate for those hours worked in excess of 40 hours per week. The lawsuit claims that the defendant must award back pay and double liquidated damages as well as costs and attorneys' fees to such employees.

   If you worked for Ecolab in the last three years as a Route Manager, Sales Route Specialist, Service Professional, or other position whose job duties primarily included repairing and providing preventive maintenance on leased commercial dish washing machines, and were not paid time and one-half for any work performed in excess of 40 hours per week, you may be eligible to join the lawsuit.

2. To Join the Case and Be Represented by Plaintiff's Counsel

   If you fit the definition above, you may join this case (that is, you may "opt in") by completing and mailing the attached "Consent to Sue" form to the plaintiff's lawyer no later than 60 days after the date of this notice at the following address:

Law Office of Dan Getman
9 Paradies Lane
New Paltz, NY 12561

The lawyer's phone number is (845) 255-9370. You may call that number if you wish to have further information about the case or if you need more help in joining the lawsuit. If you fail to return the "Consent to Sue" form to the plaintiff's lawyer in time for it to be filed with the federal court on or before the above deadline, you may not be able to participate in this lawsuit.

If you choose to join in this case, you will be bound by the judgment, whether it is favorable or unfavorable.

The attorney for the class plaintiffs is being paid on a contingency fee basis, which means that if there is no recovery, there will be no attorneys' fee. If there is a recovery, the attorney for the class will receive either a fee from the defendant or a part of any settlement obtained or money judgment entered in favor of all members of the class, as specified in the attached Consent to Sue form. If you sign and return the "Consent to Sue" form attached to this Notice, you are agreeing to designate the class representatives to make decisions on your behalf concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. These decisions and agreements made and entered into by the class representatives

will be binding on you if you join this lawsuit. However, the Court has retained jurisdiction to determine the reasonableness of any fee agreement entered into by plaintiffs with counsel, and to determine the adequacy of the plaintiffs' counsel.

3. To Join the Suit, But Not Be Represented by the Plaintiffs

You can join this lawsuit by representing yourself or by counsel of your own choosing. To do so, you or your attorney must file the appropriate documents with the Court. The address of the Court is: United States District Court, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007.

4. To Stay Out of the Lawsuit

If you do not wish to be part of the lawsuit, you need not do anything. If you do not join the lawsuit, you will not be part of the case in any way and will not be bound by or affected by the result, whether favorable or unfavorable. Your decision not to join this lawsuit will not affect your right to bring a similar case on your own in the future. However, claims under the Fair Labor Standards Act must be brought within two years, unless the employer's violation of the law was "willful," in which case the claims must be brought within three years of the alleged violation.

5. No Retaliation Permitted

The defendant is prohibited by law from taking any retaliatory action against any person, including a current employee, who joins this lawsuit. The defendant has denied the allegations of the lawsuit and has raised various defenses. No final decision on the merits of this lawsuit has been made by the Court.

Dated:


THIS NOTICE AND ITS CONTENTS HAVE BEEN AUTHORIZED BY THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF NEW YORK, THE HONORABLE MICHAEL B. MUKASEY, UNITED STATES DISTRICT JUDGE.

CONSENT TO SUE

I hereby consent to be a plaintiff in the lawsuit named Troy Masson, et al. v. Ecolab, Inc. I hereby consent to the prosecution of any claims that I may have under the Fair Labor Standards Act for unpaid overtime, liquidated damages, attorney's fees, costs, and other relief, against the defendant.

I authorize the Law Office of Dan Getman, its successors and assigns, to represent me in this case.

By signing and returning this consent to sue, I understand that I will be represented by the Law Office of Dan Getman without prepayment of attorney's fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that the Law Office of Dan Getman may petition the court for an award of fees and costs to be paid by defendant on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendant or one-third of my total settlement or judgment amount (including fees), whichever is greater.

Dated:                          Signature:
                                Name:
                                Address:
                                Phone:


Mail this form within 60 days of the date of the Notice of Lawsuit to: Law Office of Dan Getman, 9 Paradies Lane, New Paltz 12561.